The Honorable John C. Coughenour

1
2
3
4
5
6
7            UNITED STATES DISTRICT COURT FOR THE
8                WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE
9

10   UNITED STATES OF AMERICA,          CASE NO. CR20-032JCC
11                    Plaintiff,
                                        **GOVERNMENT'S RESPONSE TO**
12                                      **MOTION TO SUPPRESS**
13         v.

14
     KALEB COLE,
15
                     Defendant.
16

17

18                      **INTRODUCTION**

19         Kaleb Cole was a leader of Atomwaffen, a white-supremacist group that espouses

20   violence against minorities.  Cole helped orchestrate a campaign to target journalists,

21   Jewish people, and persons of color with threatening posters.  Some of the posters were

22   tacked onto the victims' houses in the middle of the night.  Other victims received the

23   posters through anonymous letters in the mail.

24         In January 2020, a United States Magistrate Judge for the Southern District of

25   Texas issued a search warrant for Cole's residence.  Along with other evidence described

26   in the affidavit, the affiant laid out a series of encrypted chats in which the plot's

27   participants worked together to identify their victims and planned to distribute the

28   threatening material.  The FBI had previously obtained these chats from an informant

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

who had taken screen shots of the messages.  The members of the chat group identified themselves using nicknames or handles such as "Krokodil" or "Lazarus."  One key member of the group identified himself using the following moniker made up of Hindi symbols: पकजबतचषथबल.  The affiant stated in affidavit that Cole was पकजबतचषथबल. The FBI knew पकजबतचषथबल to be Cole for various reasons, one of which was that the informant had confirmed this fact.

Cole now claims the affidavit was defective because it failed to spell out the reasons why the informant knew Cole was पकजबतचषथबल, and because the affidavit did not disclose certain information about the informant.  Cole contends the omitted information renders the informant unreliable.  Cole's motion fails for four independent reasons.

*First,* the warrant established probable cause, even setting aside the evidence that Cole was पकजबतचषथबल.  The affidavit independently established that:  (1) Cole was the co-leader and chief-propagandist for Atomwaffen; (2) Cole had made recorded statements urging that Atomwaffen should intimidate "nosy journalists" by approaching them with "nothing but pure aggression"; (3) Cole was the subject of reporting in in his home state of Washington in September 2019, when officers executed an Extreme Risk Protection Order against him; and (4) just months after this coverage, in January 2020, Atomwaffen in fact *did* send threatening communications to journalists, including C.I., a journalist from Washington.  Based on all of these facts—which are independent of Cole's use of the पकजबतचषथबल moniker or other information provided by the informant, the affidavit established probable cause.

*Second*, contrary to Cole's assertions, the affiant possessed overwhelming evidence *independent of the informant* establishing that Cole was the person using the पकजबतचषथबल moniker.  Cole's motion is premised on the assertion that "essentially all of the information supporting probable cause . . . came from the CI."  Dkt. 194 at 4. But that is simply not true.  As explained below, the FBI had an abundance of evidence

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

establishing Cole was पकजबतचषथबल.  For example, पकजबतचषथबल made statements *in the chats themselves* acknowledging he was Cole.  The FBI independently reviewed these chats and did not need to rely on the informant to reach the conclusion that Cole was पकजबतचषथबल.  In hindsight, it would have been preferable to have spelled out the various reasons why the FBI knew Cole was पकजबतचषथबल.  But courts routinely approve affidavits where agents assert that a subject is known to use a certain nickname without going into the reasons behind the assertion.  This is no different.

*Third*, under *Leon*, the agents were entitled to rely in good faith upon the Court's finding of probable cause.  Cole claims it was unreasonable for the agents to believe the affidavit set out probable cause.  But, as discussed above, the affidavit contained substantial evidence (including evidence independent of the moniker) tying Cole to the plot.  Thus, even if the Court were to conclude the affidavit did not establish probable cause, the affidavit was not so "bare bones" as to make reliance upon it unreasonable.  That this belief was reasonable is evidenced by the fact that not one, but *two* federal judges concluded the evidence in the affidavit set forth probable cause.  (The Honorable Mary Alice Theiler authorized an arrest warrant for Cole based on a Complaint that relied on the same evidence as the search warrant affidavit.)  In addition, the affidavit also was approved by two United States Attorney's Offices—this Office and the Southern District of Texas—both of which believed the affidavit set forth probable cause.  The fact that two judges and multiple prosecutors believed the affidavit established probable shows that the agent acted reasonably in reaching the same conclusion.

*Fourth*, although the defense is correct that certain potential impeachment information about the informant was not included in the affidavit, that omission is hardly fatal.  The omitted information was limited to the fact that the informant was well compensated by the FBI over a 16-year period, and was convicted of a firearms crime over 15 years ago.  The affiant did not include this information because he believed in good faith that probable cause was not dependent on the informant's credibility.  But

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

even if the informant's credibility was material to the probable cause finding, the omitted information would not have changed the outcome.  The fact that the FBI repeatedly chose to pay the informant for information over many years is a reflection of the fact that the FBI consistently found the informant's information proved *reliable*.  And, it is far-fetched to suggest that a single 15 year-old firearms conviction would have caused the magistrate judge to refuse to sign off on the warrant.  And finally, as the affidavit outlined in great detail, the agents were able to corroborate the information the informant had relayed about the plot.

## BACKGROUND

**A.    The Search Warrant Affidavit**

### 1.    Evidence of Cole's Leadership of Atomwaffen and Plot to Intimidate Journalists

FBI Special Agent Casey Villarreal authored the affidavit that was submitted in support of the search warrant for Cole's residence.  *See* Dkt. 194-1.  Special Agent Villarreal clarified that the affidavit was based not simply on his personal knowledge, but also on information shared by "other individuals during th[e] investigation," a "review of documents and records relating to th[e] investigation," and "communications with others" who had "personal knowledge of the events and circumstances" described in the affidavit.  *Id.* ¶ 3.  Special Agent Villarreal clarified that the affidavit did "not set forth each and every fact that [he] or others ha[d] learned during the course of th[e] investigation."  *Id.*

In the affidavit, Special Agent Villarreal first outlined Cole's involvement in Atomwaffen.  *Id.* ¶¶ 9-11.  Special Agent Villarreal explained that Cole, along with another individual, had been tasked to lead Atomwaffen after a prior leader was arrested in 2017.  *Id.* ¶ 11.  Special Agent Villarreal explained that "Cole is . . . [the] primary producer of propaganda for" Atomwaffen.  *Id.* ¶ 9.  Special Agent Villarreal further explained that Cole had coordinated a "hate camp" for Atomwaffen members in 2018 where members, among other things, "trained" in "creat[ing] neo-Nazi propaganda."  *Id.*

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

¶ 12.  Cole hosted the camp at an abandoned factory in Concrete, Washington, about 55 miles from Cole's Arlington residence.  *Id.*

The affidavit noted that, on February 23, 2018, the *Seattle Times* published an article discussing Atomwaffen.  *Id.* ¶ 14.  Cole was one of the Atomwaffen members identified in the article.  *Id.*  The affidavit continued that, in September 2018, Cole posted a recorded message aimed at targeting the media.  The FBI obtained the recording from the informant. The affidavit quoted Cole as saying on the recording:

> The matter of these nosy reporters coming into our daily lives where we work where we live where we go in our spare time.  *We must simply approach them with nothing but pure aggression.*  We cannot let them think that they can just that that it's safe for them to just come up to us and fuck with us We cannot let them think they are safe in our very presence alone..."

*Id.* ¶ 15 (emphasis added).  Agents had listened to this recording submitting the affidavit, and Cole's voice is easily recognizable as the speaker.

The affidavit also recounted that Cole had spoken to the FBI in July 2019, and that he had described the media as being "a threat to the public."  *Id.* ¶ 16.  The affidavit explained that in late September 2019, Cole had been served with a Washington State Extreme Risk Protection Order, under which he was required to surrender his firearms.  *Id.* ¶ 18.  Officers seized nine guns from Cole.  *Id.*  The affidavit stated that confidential human source reporting had revealed that Cole, along with other Atomwaffen members, including Cameron Shea, were upset over media coverage of the event and that one member pledged to "hit back . . . [and] embarrass the enemy on their own front."  *Id.*

The affidavit also recounts that, on January 9, 2020, an undercover officer met with Cole at the Montgomery, Texas residence where Cole was living (and where the search later occurred).  *Id.* ¶ 48.  The officer observed Cole wearing a Ku Klux Klan robe during the meeting.  *Id.*  While not specifically mentioned in the affidavit, Cole explicitly discussed the plot to intimidate journalists, including identifying potential victims in Washington State, with the officer.

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### 2.    The Encrypted Chat String

The affidavit explained that, in November 2019, shortly after the events described above, Cameron Shea established a private encrypted group chat.  *Id.* ¶ 20.  The affidavit set out ten screenshots showing examples of portions of the chats.  *Id.* ¶¶ 20-31, 44-47.  The affidavit also summarized other portions of the chats, stating that, "[a]ccording to Shea, the purpose of the operation was to "send a clear message that we [Atomwaffen] . . . have leverage over them  The goal of course is to erode the media/states air of legitimacy by showing people they have names and addresses and hopefully embolden others to act as well."  *Id.*  The affidavit stated that Cole was part of the chat group, and that "Khim," whom the affidavit identified as being Cole, was developing a number of posters that "are threatening but not explicitly."  *Id.*

The affidavit explained that Cole, using the moniker पकजबतचषथबल, stated that newer Atomwaffen members whose identities were not publicly known would carry out the operation.  *Id.* ¶ 21.  The affidavit showed पकजबतचषथबल's extensive participation in the plot, including that he gathered victim addresses, that he advised other members as to operational security, and that he distributed the posters via encrypted email.  *Id.*

### 3.    Evidence the Plot was Executed

The affidavit then described how the operation had been carried out.  *Id.* ¶¶ 32-43.  As the affidavit explained, in Washington State, agents had surveilled Shea and observed him change into a disguise to purchase a book of distinctive stamps.  *Id.* ¶ 32.  On January 29, 2020, a Seattle journalist with the initials C.I. who had reported on Atomwaffen contacted the FBI to report that he had received one of the threatening posters in the mail.  *Id.* ¶ 33.  Though not specifically noted in the affidavit, C.I. had specifically reported on Cole and had conducted an on-camera visit to Cole's family home seeking an interview.  Other victims also contacted the FBI and reported that they had received in the mail threatening Atomwaffen posters.  *Id.* ¶ 33. All the posters bore the distinctive stamps that Shea had purchased.  *Id.* ¶¶ 33-34.  In Florida and Arizona,

1  agents surveilled other members Atomwaffen carry out the operation by delivering

2  threatening posters.  *Id.* ¶¶ 35-43.

3  **B.**    **The Agents Possessed Substantial Evidence Independent of the Informant**

4  **Tying Cole to the पकजबतचषथबल Moniker.**

5          Cole asserts "it is not entirely clear even to this day what the government's basis is

6  for attributing moniker to Cole."  Dkt. 194 at 6.  In fact, Special Agent Villarreal and the

7  team of agents working with him had overwhelming evidence that Cole was

8  पकजबतचषथबल.  As will be demonstrated at trial in this case, पकजबतचषथबल

9  acknowledged he was Cole on multiple occasions during chats that were reviewed by the

10  FBI before the FBI obtained the warrant.  As one example, an Atomwaffen member sent

11  पकजबतचषथबल an article about the Extreme Risk Protection Order having been served

12  on Cole:

13  ● **@पकजबतचषथबल पगचतश** https://www.king5.com/amp/article

14  /news/investigations/ar-15-ghost-gun-parts-seized-from-neo-nazi-leader-

15  in-snohomish-county/281-dc4bb686-2621-4dc3-9ef6-

16  d66c7c44e156?__twitter_impression=true



17  AR-15 &#39;ghost gun&#39; parts seized from neo-Nazi

18  leader in Snohomish County

19  king5.com/amp/article/news/investigations/ar-15-ghost-gun-parts-seized-from-neo...

20

21  ● "Thursday at 6:30 p.m., the KING 5 Investigators reveal court documents that

22  contain more information about Kaleb Cole, including new information about

23  Cole's legal troubles in Canada and the case the FBI is building against him."

24          In response to receiving the article, पकजबतचषथबल acknowledged he was Cole

25  by complaining at length about not being able to afford an attorney to contest the petition:

26

27

28

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

पकजबतचषथबल

sadly it seems there I may not be getting much more help.

Its not like there's any way I could really pay them.

I am a broke motherfucker

Krokodil

Maybe a lawyer that you pay only if you win?

पकजबतचषथबल

Not many of those.

I wouldnt be paid money if I fight for my civil rights.

Only if I sue the courts, but that is too far ahead.

. . .

Krokodil

@पकजबतचषथबल पगचतश   sue for damages due to the illegal seizure

If it's over turned, it had been illegal, and that entitles you to compensation

ESPECIALLY since it lead to you losing your job

पकजबतचषथबल

and losing a place to live, and damage to family and friends.

Krokodil

Yeah exactly, that's all stuff you can sue for if the judge rules the seizure illegal

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 8

but first I would have to get legal help to make fools out of these bureaucrats in court, get my rights back and THEN sue.

In another example, पकजबतचषथबल shared with the chat group a link to an article about a warrant being issued for Cole's arrest in Washington following Cole's violation of the Extreme Risk Protection Order.  पकजबतचषथबल commented that, as a result of the warrant, पकजबतचषथबल would not be returning to Washington.  (Cole by this time had moved to Texas.)  When another member commented that "at least [Cole's warrant is] nonextraditable, पकजबतचषथबल responded "DAMN RIGHT":

https://www.seattletimes.com/seattle-news/crime/suspected-washington-leader-of-neo-nazi-group-charged-with-violating-gun-ban-under-states-red-flag-law/

Well that settles it, I'm not returning!

Ryan
At least it's non extraditable

DAMN RIGHT.

In yet another example, पकजबतचषथबल referenced being on "trial[]" in Canada and that the trial involved a "blood eagle for every bureaucrat" poster:

I've already mentioned before that my trials in Canada were something I didn't want getting out. I *really* hope the whole thing is not put out, but if they placea snippet,  hope its the part where I describe a bloody eagle for every bureaucrat in detail, lol.

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970



पकजबतचषथबल

> They pulled up the "blood eagle for every bureaucrat" poster as evidence. she says "what's a blood eagle?" and I describe in vivid detail what a blood eagle is. Then she is like "so that seems like a blatant threat to bureaucrats!" then I said something like "no it's not saying to go and do that". "Then what *is* it saying". Then I said something to the effect of "it's saying that these people don't deserve to simply go out of office, with a nice little pension and vacation. That they deserve to be punished".

> in other words: I was describing her and every other bureaucrat there that they need to be punished lol

> of course the transaction I laid out for you is paraphrased.

As the FBI knew at the time the search warrant was submitted, Cole had been the subject of a contested immigration hearing in Canada. And, in an audio recording that the FBI had in its possession, Cole discussed being asked about the "blood eagle for every bureaucrat" poster during the Canadian hearing.

As a final example, the affidavit noted that, in one of the encrypted chats, पकजबतचषथबल "suggested buying rag dolls and knives so that one could leave a doll knifed through the head at their target location." As the FBI knew, during the January 23, 2019 meeting with the undercover officer, Cole had recounted a story about another hate group using knives to affix rag dolls to trees. Cole suggested in the undercover meeting that the group attempt to "recreate" this in their plot against journalists.

## C.   The Omitted Information About the Informant

The informant has provided information to the FBI since approximately 2003, and has received a total of approximately $140,000, which included both compensation and reimbursement for expenses. He has been provided $78,133.20 in compensation and reimbursement since February 7, 2018, which almost entirely coincided with his work on Atomwaffen. The informant has a prior firearms conviction that was sustained over

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

fifteen years ago.  The informant is not known to have ever made any false statements or otherwise engaged in dishonesty.

## ARGUMENT

### A.    The Affidavit Sets Forth Probable Cause Apart from Any Statements Made by the Informant

A search warrant is supported by probable cause if the issuing judge finds that, "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "In order to establish probable cause, the warrant affidavit must contain specific information that would allow a magistrate to independently determine whether probable cause exists."  *United States v. Payne*, 2008 WL 11358001, at *2 (C.D. Cal. Oct. 7, 2008).

As the Ninth Circuit has instructed, there need only be "a reasonable nexus between the activities supporting probable cause and the locations to be searched." *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993) (internal quotation omitted).  "A 'reasonable nexus' does not require direct evidence that the items listed as the objects of the search are on the premises to be searched.  The magistrate must only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit."  *Id.* (internal quotation omitted); *see also United States v. Walker*, 2020 WL 3841312, at *3 (E.D. Cal. July 8, 2020) ("The required nexus between the alleged criminal behavior and the location to be searched does not set a high bar . . . .").

The affidavit established probable cause to conclude that evidence of the plot was likely to exist at Cole's residence.  *First*, the affidavit establishes probable cause even if the moniker is not attributed to Cole.  That is, regardless of whether Cole was पकजबतचषथबल, the affidavit established (a) the existence of an Atomwaffen plot to intimidate journalists; and (b) Cole was part of the plot.  With regard to the existence of the plot, whether or Cole was पकजबतचषथबल, the chat string serves to establish that Atomwaffen planned to intimidate journalists using threatening posters.  And, the

affidavit sets out extensive evidence that the plot actually occurred, that is, journalists and others did in fact receive threatening Atomwaffen-branded messages.  Affidavit ¶¶ 32-43.

The affidavit also contains substantial evidence—separate and apart from the पकजबतचषथबल moniker—linking Cole to the plot.  The affidavit identified Cole as the co-leader of Atomwaffen and the "primary producer of propaganda" for the group.  Affidavit ¶¶ 9, 11.  It notes that Cole was the subject of a Seattle Times article about Atomwaffen that specifically identified Cole.  *Id.* ¶ 14.  It quotes a recorded statement by Cole urging that the group must approach "nosy reporters" with "nothing but pure aggression," and that "we cannot let them think they are safe."  *Id.* ¶ 15.  It recounts that Cole made explicit statements to the FBI complaining that the media had sensationalized Atomwaffen and had specifically targeted Cole.  *Id.* ¶ 17.  It notes that Cole was the subject of coverage by several Washington media outlets when we was served with an Extreme Risk Protection Order in September 2019.  *Id.* ¶ 18.  And importantly, the affidavit also recounts that, just a few months later, C.I., a journalist from Washington (Cole's home state) received one of the threatening Atomwaffen mailings. *Id.* ¶ 33.

None of the foregoing facts rely on Cole being identified as पकजबतचषथबल, but together they leave little doubt that Cole was a participant in the plot.  It would be untenable to believe that, following Cole's exposure by Washington state journalists, Atomwaffen executed a plot to intimidate journalists, including a journalist from his home state of Washington, without the knowledge and say-so of Cole, Atomwaffen's chief propagandist, who was leading the charge to approach "nosy reporters" with "nothing but pure aggression."  Thus, even if one were to excise the portions of the affidavit that identify Cole as पकजबतचषथबल, the affidavit would still establish probable cause.

*Second,* it was permissible for the magistrate to credit the affidavit's assertion that Cole is पकजबतचषथबल.  Cole cannot seriously dispute that probable cause existed if Cole is identified as पकजबतचषथबल.  As detailed above and in the affidavit,

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

पकजबतचषथबल was deeply involved in organizing and planning the operation.  In the affidavit, Special Agent Villarreal told the Court that Cole was the person using the moniker, and as set forth above, the agent possessed overwhelming evidence that this was in fact true, even apart from any statements made by the informant.

Cole claims the affiant's identification of Cole as पकजबतचषथबल must be suppressed because the agent failed to delineate the specific facts underlying his (clearly correct) statement that Cole was पकजबतचषथबल.  Although, in hindsight, the government easily could have set out those facts, the magistrate judge could properly rely on the agent's identification of Cole as पकजबतचषथबल.  It is not uncommon for officers to state in affidavits that they or that fellow officers "know" that the target goes by a particular nickname based on their investigation or prior dealing with the target.  *See United States v. Alvarez,* 190 F. Supp. 3d 885, 888 (N.D. Cal. 2016); *United States v. Rios-Lopez*, 2011 WL 13142502, at *2 (E.D. Wash. Oct. 7, 2011); *United States v. Ramsey*, 2013 WL 6388518, at *1 (M.D. Pa. Dec. 5, 2013); *United States v. Palma*, 2008 WL 5273746, at *6 (N.D. Cal. Dec. 19, 2008); *United States v. Angulo-Lopez*, 8 F.3d 30 (9th Cir. 1993) (unpublished).

Here, the पकजबतचषथबल moniker was, in essence, a nickname for the person sending the chats.  The magistrate judge, like the judges in the cases cited above, could (and did) choose to rely on the affiant's assertion that Cole was पकजबतचषथबल.  To the extent that the affiant was incorrect in this assertion, Cole's remedy would be to seek a *Franks* hearing to provide the full context for the assertion.  *See, e.g.*, *United States v. Chesher*, 678 F.2d 1353, 1360 (9th Cir. 1982) (fact that affidavit asserted falsely that defendant was a Hells Angel did not undercut magistrate's finding of probable cause; falsity could be raised as a *Franks* issue).  Here, however, such a hearing would be inappropriate because, for reasons set out above, the assertion at issue—that Cole is पकजबतचषथबल—is undeniably *true*.

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.      Even Assuming the Affidavit Failed to Establish Probable Cause, the Agents Were Entitled to Rely Upon the Determinations by Two Federal Judges That Probable Cause Existed**

"The exclusionary rule does not apply to an officer's "objectively reasonable reliance on a subsequently invalidated search warrant," unless the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Jobe*, 933 F.3d 1074, 1077 (9th Cir. 2019) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)). "Even if an affidavit fails to establish probable cause, an officer cannot be expected to question the magistrate's probable-cause determination, unless the affidavit is 'bare bones,' *i.e.*, it fails to provide a colorable argument for probable cause." *Id.* (internal quotations omitted). The Court need not reach the question of whether an affidavit is supported by probable cause if the agents relied in good faith on judicial approval of the warrant. *See United States v. Crews*, 502 F.3d 1130, 1136 (9th Cir. 2007) ("Before embarking on the exercise of determining whether the affidavit supported probable cause, we may proceed directly to the issue of whether there was good faith reliance.").

As discussed in Section A above, the affidavit contained substantial evidence against Cole.  And setting aside whether the affidavit *actually* met the legal standard, it was certainly reasonable for the agents to believe it did.  That is particularly true given that, at the time officers executed the warrant, they knew a United States Magistrate Judge for the Southern District of Texas had reviewed the affidavit and concluded that it had established probable cause.  They also knew that a separate United States Magistrate Judge in the Western District of Washington had reviewed the Complaint, which was based on the same evidence, and likewise concluded that it had established probable cause to arrest Cole.  It was not unreasonable for the agents to rely on these two judicial determinations, let alone that multiple Assistant United States Attorneys had approved of the warrants.  *See United States v. Taxacher*, 902 F.2d 867, 872 (11th Cir. 1990) ("In this case Officer Riner consulted with the local district attorney before seeking the search

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

warrant, and then submitted the matter to a neutral magistrate.  These steps are indicative of objective good faith.").

The officers were acting in good faith:  the affidavit contained substantial evidence linking Cole to the plot; and they were entitled to rely upon the twin judicial determinations that probable cause existed.  In these circumstances, even if the affidavit fell short of establishing probable cause, suppression is not an appropriate remedy.

## C. The Affiant Did Not Recklessly or in Bad Faith Omit Information About the Informant

As set forth above, the affiant knew that पकजबतचषथबल was Cole for the separate reason that the informant advised agents as such.  Dkt. 194-1 ¶ 20.  Once again, if this assertion is credited, the affidavit clearly sets forth probable cause.  The defense, however, claims that the Court cannot do so because the affiant did not advise the Court that the informant (1) had been paid for his information and (2) had a 15-year-old firearms conviction.

A defendant is entitled to a *Franks* hearing on "the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000).  The defendant's allegations must be accompanied by a detailed offer of proof, preferably in the form of affidavits." *United States v. Kiser*, 716 F.2d 1268, 1271 (9th Cir. 1983) (citing *Franks*, 438 U.S. at 171; *United States v. Chesher*, 678 F.2d 1353, 1360 9th Cir. 1982); *United States v. Young Buffalo*, 591 F.2d 506, 509 (9th Cir. 1979)). A "misleading omission" must be material.  *See generally Crowe v. County of San Diego*, 593 F.3d 841, 870 (9th Cir. 2010).  An omitted fact is material if its inclusion in the affidavit would have "'cast doubt on the existence of probable cause.'" *United States v. Garza*, 980 F.2d 546, 551 (9th Cir. 1992) (quoting *United States v. Dennis*, 625 F.2d 782, 791 (8th Cir. 1980)).  Under *Franks*, "[a]llegations of negligence or innocent mistake

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    are insufficient" to obtain a hearing.  *Franks*, 438 U.S. at 171; *see also United States v.*

2    *Miller*, 753 F.2d 1475, 1478 (9th Cir. 1985).

3            Cole's request for a *Franks* hearing should be denied for two reasons.  *First*, the

4    nature of the potential impeachment information must be balanced against the fact that

5    the informant's statements were corroborated in that the *plot actually happened*.  This is

6    not a case where an informant provided information that a defendant *was planning* to

7    commit or a crime, or *was committing a crime*, and law enforcement, based on the

8    informant's tip, obtained a search warrant.  Rather, this was a case where the informant

9    told law enforcement that particular crime was being planned, *and then the crime did in*

10   *fact occur*—just as the informant predicted.

11           A *Franks* hearing is not "required every time some substantial adverse information

12   about an informant's credibility is omitted from a probable cause affidavit." *United States*

13   *v. Clark*, 935 F.3d 558, 565 (7th Cir. 2019). "When law enforcement has sufficiently

14   corroborated the informant's information, 'the omission of facts pertaining to the

15   informant's credibility may not be material.'"  *United States v. Hannah*, 2021 WL

16   3173571, at *17 (C.D. Ill. July 27, 2021) (quoting *Clark*, 935 F.3d at 565); *see also*

17   *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986) ("[A]n informant's

18   reliability may be demonstrated through independent police corroboration of the

19   information provided.").

20           In addition, the significance of the potential impeachment information needs to be

21   put into perspective.  First, the informant's criminal history was limited to a firearms

22   conviction that occurred *over fifteen years ago*, which hardly bears on the informant's

23   capacity for truthfulness.  *See United States v. Roddy*, 119 F. App'x 126, 129 (9th Cir.

24   2004) ("Finally, even though Officer Mitsunaga knowingly omitted the CI's criminal

25   history from the warrant affidavit, we conclude that this omission does not satisfy the

26   second prong of *Franks*.  None of the CI's past offenses are crimes of dishonesty that are

27   relevant to his veracity as an informant.).

28

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Similarly, the fact that the informant was compensated is not a particularly compelling reason to doubt the informant's credibility.  Indeed, the fact that the FBI deemed the informant reliable enough to pay approximately $140,000 for the informant's information over 16 years tends to suggest that the informant *is reliable*.  Moreover, the informant's history of receiving compensation created an incentive for the informant to continue to give reliable information.  Thus, this is not the traditional case of an informant who provides information because he is desperate to avoid a lengthy prison sentence.  And, there is no suggestion the informant had even been untruthful or committed any acts of dishonesty in the past or in connection with this investigation.  Thus, even had the potential impeachment information been before the Court, it would not have given cause to seriously doubt his or her veracity.

*Second*, a *Franks* hearing is unwarranted because the affiant's failure to include the potential impeachment information was the result of either an "innocent mistake" or "negligence."  *Franks*, 438 U.S. at 171.  The affiant would have included the potential impeachment information in the affidavit had he appreciated that the credibility of the informant might be at stake.  But the government believed in good faith that the allegation that Cole was पकजबतचषथबल did not turn on the informant's credibility.  As outlined above, the government had *overwhelming* proof that Cole was पकजबतचषथबल, independent of the informant, and this was the primary basis for the repeated assertions to the Court that Cole was पकजबतचषथबल.  There was no bad faith attempt to conceal the potential impeachment information.  Had anyone appreciated that the informant's credibility might be at stake, the potential impeachment information would have been supplied to the Court, along with a description of the numerous ways in which the informant's statements that Cole was पकजबतचषथबल had been corroborated.

The reasons underlying the suppression remedy are to deter police officers who act in bad faith or who otherwise act improperly.  *See generally Herring v. United States*, 555 U.S. 135, 141, (2009).  That is not what happened here.  The agents acted in good

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 17

1   faith and made entirely truthful statements to the Court.  The failure to supply the

2   potential impeachment information was not intentional or intended to mislead anyone.

3   "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that

4   exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is

5   worth the price paid by the justice system." *Id.*  That standard is not met here.

6                                **CONCLUSION**

7        For the foregoing reasons, the motion to suppress should be denied.

8        DATED:  August 20, 2021

9                                    Respectfully submitted,

10                                   TESSA M. GORMAN
                                     Acting United States Attorney
11

12                                   */s/ Thomas M. Woods*
13                                   THOMAS M. WOODS
                                     SETH WILKINSON
14                                   Assistant United States Attorneys
                                     United States Attorney's Office
15                                   700 Stewart Street, Suite 5220
                                     Seattle, Washington 98101-1271
16                                   Telephone: (206) 553-7970
17

18

19

20

21

22

23

24

25

26

27

28

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to all registered parties.

<u>*s/ Thomas Woods*</u>
THOMAS WOODS
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271

Government's Response to Motion to Suppress
*U.S. v. Cole*, CR20-032JCC - 19