The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>                    v.<br><br>KALEB COLE,<br><br>                    Defendant. | CASE NO. CR20-032JCC<br><br>**GOVERNMENT'S TRIAL BRIEF** |

The United States of America, by and through Tessa M. Gorman, Acting United States Attorney for the Western District of Washington, and Thomas M. Woods and Seth Wilkinson, Assistant United States Attorneys for said District, respectfully submits its trial brief.

## **TRIAL OVERVIEW**

Defendant Kaleb Cole is charged with five offenses arising out of his plot to intimidate journalists and Anti-Defamation League members by delivering threatening posters to their homes.  The government anticipates calling approximately fifteen witnesses in its case in chief.  The government expects that its case in chief will take approximately three to four trial days, depending upon the length of cross examination.

1    AUSA Seth Wilkinson will give the opening statement and the rebuttal argument.
2  AUSA Thomas Woods will give the closing argument.  AUSA Wilkinson also will
3  handle *voir dire* on behalf of the government.

### FACTUAL BACKGROUND

**A.  The Scheme**

In November 2019, Cameron Shea, a member of the neo-Nazi group Atomaffen
Division ("AWD"), contacted an FBI confidential human source ("CHS") over an
encrypted communication service called Wire.  Shea, who used the moniker "Krokodil,"
invited the CHS to participate in an operation to intimidate journalists by delivering
threatening posters to their homes.  Shea wrote:



Krokodil

Also, I wanted to run this by you:
we're coordinating this nation wide
operation called Operation Erste
Säule, named after the first pillar of
stat power, AKA the media. We will be
postering journalists houses and
media buildings to send a clear
message that we too have leverage
over them, and that we aren't scared
of their articles or public defamation.

The goal, of course, is to erode the
media/states air of legitimacy by
showing people they have names
and addresses, and hopefully
embolden others to act as well. Do
you have anyone in the East Coast
Alumni who would be willing to
partake?

Defendant Kaleb Cole is one of AWD's leaders and is responsible for producing AWD propaganda. Shea told the CHS that Cole, who at the time was using the nickname "Khim," was developing the posters. Shea wrote:



Khim is developing a number of posters that are threatening but not explicitly. In 24 hours I follow up with everyone regarding their progress on finding their targets

Shea also wrote that AWD members from around the country had started to identify targets:

Krokodil

FL cell has acquired 5 targets including home addresses, CA has acquired 4 targets including addresses, and OR has acquired 3 targets including a "cultural center" media building

Shea told the CHS that he had already formed an encrypted chat group titled "Operation Erste Säule." Cole participated in the chat group using the moniker

Government's Trial Brief
*U.S. v. Cole*, CR20-032JCC - 3

पकजबतचषथबल, which is made up of Hindi characters.  As reflected by the chats, Cole played three roles in the scheme.

First, Cole developed the posters that were used in the operation.  In particular, he circulated a template of a poster that was later used in the operation:





Cole later told the group that he had developed three posters—in fact, three posters were later used in the operation:



He also collected victim address information to be inserted in the "address goes here" section of the posters:



He then distributed the completed posters to members using an encrypted email service:

पकजबतचषथबल 🗑

**25 MINUTES AGO**

Hey guys, sorry to get here so late. So I just wanted to let you all know that I sent the posters out to all of the emails.

subject line should be "prop-run"

and I used guerrillamail

I've been having issues with my linux machine (hence why I haven't been around the last couple days).

Second, Cole provided instructions to members as to how to carry out the scheme. Cole directed that "newer initiates," who were not publicly known to belong to AWD, should deliver the posters:



Cole also encouraged members to film the delivery of the posters for propaganda purposes:



Cole also instructed members to take measures to avoid detection, and to surveil the victims' houses in advance of the operation:

पकजबतचषथबल

Now we are still working on some more people getting addresses, and we're working on some more posters and such. we want this to be a *real* good campaign.

In the meantime, those that have their targets already, feel free to do recon (Even over google maps, with the proper electronic opsec measures) of the addresses if you haven't.

\*      \*      \*

**14ALG88**

Everything I print at the library shows up on the clerk's monitor, I tested it with printing out a resume. I'm not sure how I'm gonna get prop

I might just have to improvise, the message will get across

पकजबतचषथबल

You can also go on craigslist, people sell printers on there for cheap.

09:02 PM · 23:59 remaining

I definitely wouldn't use the library, you could also go to a spot like kinkos or something (depending on the surveillance around the place).

\*      \*      \*

Third, Cole participated in selecting the victims, and strategized to maximize the fear they would feel when they received his posters.  As Cole told his followers, the goal was to "intimidate" the victims by causing "frenzy" and instilling "fear":

To maximize his victims' fear, Cole encouraged members to tack rag dolls with a knife on trees at the victims' houses:



Cole also was extensively involved in identifying victims and collecting their information:



**14ALG88**

**@Krokodil**

List sent, three jews

पकजबतचषथबल

hold up

I'll czech the email

**14ALG88**

Including the lead director of several local stations and a member of the Jewish Community Center, who is a writer for the Jewish Journal

पकजबतचषथबल

NICE WORK

\*       \*       \*

1
2
3
4
5
6
7
8
9



10 * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27 * * *
28



**Roman**

Thanks, Krokodil. Happy to be apart, hope I can help. Has anyone already devised an easy way to find these journalists? I'm literally going to a local news outlet, scouring for any names tacked onto political or opinion pieces that are directly attacking what we represent.



**Lazarus**

Well, if you can't find anyone going after what we represent, we can still send a message to any journalist in your area



**पकजबतचषथबल**

@**Roman**  Often addresses will be listed on websites such as whitepages, or other websites like whitepages.

**Roman**

Of course, whitepages and all that, just trying to find someone to go and search for. I've just started, but I'll keep looking.

On January 9, 2020, in the midst of Cole's planning of the operation on the encrypted chat service, the CHS and an undercover agent visited Cole at his Texas residence. Cole answered the door wearing a Ku Klux Klan robe:



During the meeting, which was recorded, Cole talked about the plot.  He specifically identified two sets of victims.  First, he identified a member of Seattle's Anti-Defamation League ("ADL").  The ADL's mission, among other things, is to combat anti-Semitism.  He also identified a Seattle news reporter.  This reporter had done a series of stories on Cole's involvement in AWD.

On January 25-26, the operation launched.  An AWD member affixed a poster to the bedroom window of a journalist in Arizona associated with a Jewish publication.  The poster depicted a man in a skull mask holding a Molotov cocktail in front of a burning house:



The poster also included the victim's name and home address at the bottom of the poster, along with Atomwaffen's symbol (known as a "radiation shield") and the message "YOU HAVE BEEN VISITED BY YOUR LOCAL NAZIS."

In Florida, two AWD members affixed the following poster to the house of a person that they wrongly believed belonged to a news reporter who was born in Puerto Rico:



The news reporter's name and home address were listed on the poster, again with the message that "YOU HAVE BEEN VISITED BY YOUR LOCAL NAZIS."  The Florida house that the AWD members targeted in fact belonged to a Black woman who had no connection to the news reporter.

In Washington State, the Seattle news reporter who Cole had targeted received the following poster in the mail, which depicted people in skull masks holding guns under the words "Death to Pigs":



Finally, two members affiliated with the Seattle ADL received posters in the mail.  One of the victims received the Molotov cocktail poster while the other received the "We Are Watching" poster that Cole had circulated to the group during the encrypted chats.

### B.  The Search Warrant

On February 26, 2020, FBI agents arrested Cole and searched his residence. Agents seized a computer from Cole's room.  The computer contained the names of three victims in slack space, which suggested that the data had been deleted at some point from the computer.  Specifically, his computer contained the name of the Seattle news reporter along with his office and cell phone numbers—the poster that the Seattle news reporter received contained his office and cell phone numbers printed at the bottom.  The Arizona reporter's name appeared next to the phrase "consequences.psd."  A ".psd" file refers to a Photoshop document, *i.e.*, the type of application that would be used to create a poster. The poster that the Arizona reporter received contained the word "consequences" in the title.  Finally, the Florida news reporter's name appeared close to the file titled 'We are

everywhere." The poster that targeted the reporter contained the phrase "We are everyone." Agents also recovered from Cole's computer the unique photograph that the user of the Hindi moniker had used as his profile photograph during the encrypted chats.

Agents also recovered military-style jackets from Cole's room that contained AWD radiation shield shoulder patches. Cole's room also contained AWD and Nazi flags.

**C. Tying Cole to the Hindi Moniker**

As noted above, the government will offer a video recording showing Cole discussing the plot. In addition, the government will offer several pieces of evidence tying Cole to the Hindi moniker that he used during the Wire chats, even apart from the fact that the profile photograph associated from the moniker was recovered from Cole's computer. For example, an AWD member sent पकजबतचषथबल an article about a Washington State Extreme Risk Protection Order having been served on Cole under which his guns were seized:

@पकजबतचषथबल पगचतश https://www.king5.com/amp/article/news/investigations/ar-15-ghost-gun-parts-seized-from-neo-nazi-leader-in-snohomish-county/281-dc4bb686-2621-4dc3-9ef6-d66c7c44e156?__twitter_impression=true



AR-15 &#39;ghost gun&#39; parts seized from neo-Nazi leader in Snohomish County

king5.com/amp/article/news/investigations/ar-15-ghost-gun-parts-seized-from-neo-

"Thursday at 6:30 p.m., the KING 5 Investigators reveal court documents that contain more information about Kaleb Cole, including new information about Cole's legal troubles in Canada and the case the FBI is building against him."

In response to receiving the article, पकजबतचषथबल acknowledged he was Cole by complaining at length about not being able to afford an attorney to contest the petition:

पकजबतचषयथबल

sadly it seems there I may not be getting much more help.

Its not like there's any way I could really pay them.

I am a broke motherfucker

**Krokodil**

Maybe a lawyer that you pay only if you win?

पकजबतचषयथबल

Not many of those.

I wouldnt be paid money if I fight for my civil rights.

Only if I sue the courts, but that is too far ahead.

**Krokodil**

@पकजबतचषयथबल पगचतश  sue for damages due to the illegal seizure

If it's over turned, it had been illegal, and that entitles you to compensation

ESPECIALLY since it lead to you losing your job

पकजबतचषयथबल

and losing a place to live, and damage to family and friends.

**Krokodil**

Yeah exactly, that's all stuff you can sue for if the judge rules the seizure illegal

पकजबतचषथबल
but first I would have to get legal help to make fools out of these bureaucrats in court, get my rights back and THEN sue.

In another example, पकजबतचषथबल shared with the chat group a link to an article about a warrant being issued for Cole's arrest in Washington following Cole's violation of the Extreme Risk Protection Order. पकजबतचषथबल commented that, as a result of the warrant, पकजबतचषथबल would not be returning to Washington. (Cole by this time had moved to Texas.) When another member commented that "at least [Cole's warrant is] nonextraditable, पकजबतचषथबल responded "DAMN RIGHT":

पकजबतचषथबल
https://www.seattletimes.com/seattle-news/crime/suspected-washington-leader-of-neo-nazi-group-charged-with-violating-gun-ban-under-states-red-flag-law/

Well that settles it, I'm not returning!

Ryan
At least it's non extraditable

पकजबतचषथबल
DAMN RIGHT.

In yet another example, पकजबतचषथबल referenced being on "trial[]" in Canada and that the trial involved a "blood eagle for every bureaucrat" poster:

पकजबतचषथबल
I've already mentioned before that my trials in Canada were something I didn't want getting out. I *really* hope the whole thing is not put out, but if they placea snippet,  hope its the part where I describe a bloody eagle for every bureaucrat in detail, lol.

 पकजबतचषथबल

- They pulled up the "blood eagle for every bureaucrat" poster as evidence. she says "what's a blood eagle?" and I describe in vivid detail what a blood eagle is. Then she is like "so that seems like a blatant threat to bureaucrats!" then I said something like "no it's not saying to go and do that". "Then what *is* it saying". Then I said something to the effect of "it's saying that these people don't deserve to simply go out of office, with a nice little pension and vacation. That they deserve to be punished".

- in other words: I was describing her and every other bureaucrat there that they need to be punished lol

- of course the transaction I laid out for you is paraphrased.

As will be shown at trial, Cole had been the subject of a contested immigration hearing in Canada.  And, in an audio recording that the FBI captured, Cole discussed being asked about the "blood eagle for every bureaucrat" poster during the Canadian hearing.

        In addition, as outlined above, पकजबतचषथबल "suggested buying rag dolls and knives so that one could leave a doll knifed through the head at their target location." During the January 2020 meeting with the undercover officer and the CHS, Cole had recounted a story about another hate group using knives to affix rag dolls to trees.  Cole suggested in the undercover meeting that the group attempt to "recreate" this in their plot against journalists.

        Finally, the Bureau of Prisons recovered from Cole's cell a cipher containing Hindi characters.  The cipher contains each of the characters that make up the moniker that Cole used during the chats.

## LEGAL OVERVIEW

        Cole is charged in the Superseding Indictment with five crimes.  Count 1 charges Cole with conspiracy, in violation of Title 18, United States Code, Section 371.  The Superseding Indictment alleges three objects of the conspiracy: (1) Mailing Threatening Communications, Title 18, United States Code, Section 876(c); (2) Stalking, Title 18,

United States Code, Section 2261A, and (3) Interference with Federally-Protected

Activity, Title 18, United States Code, Section 245.  Counts 2-4 charge Cole with three

substantive counts of Mailing Threatening Communications, in violation of Title 18,

United States Code, Section 876(c).  These counts relate to the three posters that were

mailed to victims in Washington State.  Finally, Count 5 charges Cole with a substantive

count of Interference with Federally-Protected Activity, Title 18, United States Code,

Section 245.  This count relates to the poster that was sent to the Seattle ADL member

that contained depicted the man in a skull mask holding a Molotov cocktail, and alleges

that Cole sent this poster to interfere with the victim's employment by ADL.

The law regarding these counts is discussed below.

**A.    Conspiracy**

Section 371 makes it a crime for "two or more persons to conspire . . . to commit

any offense against the United States . . . and one or more of such persons [to] do any act

to effect the object of the conspiracy."  To convict a defendant of conspiracy, the

government must prove that: (1) there was an agreement between two or more persons to

commit a particular crime charged in the indictment; (2) each defendant became a

member of the conspiracy knowing at least one of its objects and intending to help

accomplish it; and (3) one of the members of the conspiracy performed at least one overt

act for the purpose of carrying out the conspiracy.  The jury must all agree as to the

particular overt act.  Ninth Circuit Model Jury Instructions 8.20; *see also*

*United States v. Falcone*, 311 U.S. 205, 210 (1940); *United States v. Montgomery*, 384

F.3d 1050, 1062 (9th Cir. 2004).

The agreement to engage in criminal activity between the conspirators need not be

explicit, but may be inferred from circumstantial evidence.  *United States v. Sullivan*, 522

F.3d 967, 976 (9th Cir. 2008); *United States v. Morland*, 509 F.3d 1201, 1218

(9th Cir. 2007); *United States v. Thomas*, 586 F.2d 123, 127-32 (9th Cir. 1978).  Indeed,

the agreement may consist of nothing more than a tacit understanding.  *United States v.*

*Mohr*, 728 F.2d 1132, 1135 (8th Cir. 1984).  Proving the crime of conspiracy requires

proof of an overt act.  *Falcone*, 311 U.S. at 210.  The overt act need not itself be a crime;

its function is merely to show "that the conspiracy is operative."  *United States v.*

*Buckner*, 610 F.2d 570, 573 (9th Cir. 1979).  Knowledge of the objectives of the

conspiracy is an essential element.  *United States v. Rizk*, 660 F.3d 1125, 1134

(9th Cir. 2011) (citing *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987)).

However, similar to the agreement itself, "the government need not prove knowledge

with direct evidence; circumstantial evidence and the inferences drawn from the evidence

can sustain a conspiracy conviction."  *United States v. Wright*, 215 F.3d 1020, 1028 (9th

Cir. 2000).  "Once a conspiracy is established[,] only a slight connection to the

conspiracy is necessary to support a conviction."  *United States v. Reed*, 575 F.3d 900,

924 (9th Cir. 2009) (quoting *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095

(9th Cir. 2001)). The term "slight connection" means that a defendant need not have

known all the conspirators, participated in the conspiracy from its beginning, participated

in all its enterprises, or known all its details. *Id.*

One who joins an ongoing conspiracy is bound by all acts of coconspirators taken

in furtherance of the conspiracy.  *See, e.g.*, *United States v. Traylor*, 656 F.2d 1326, 1337

(9th Cir. 1981) (citing *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969)).  A

coconspirator is also responsible for all reasonably foreseeable substantive crimes

committed in furtherance of the conspiracy, even if he or she did not participate in or

have knowledge of their commission.  *See, e.g.*, *Pinkerton v. United States*, 328 U.S. 640

(1946); *United States v. Reed*, 726 F.2d 570, 580 (9th Cir. 1984); *United States v. Ferris*,

719 F.2d 1405, 1408 (9th Cir. 1983); *United States v. Shaprio*, 669 F.2d 593, 596 n.2 (9th

Cir. 1982).  Thus, the act of one conspirator is the act of all.  *See, e.g.*, *Phillips v. United*

*States*, 356 F.2d 297, 303 (9th Cir. 1966).

Finally, "[t]he rule is well established that the government in a conspiracy case

may submit proof on the full scope of the conspiracy; it is not limited in its proof to the

overt acts alleged in the indictment."  *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir.

2011); *accord United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004)

(acts that occurred within the temporal scope of the conspiracy and were inextricably intertwined with the conspiracy are not subject to Rule 404(b) analysis). Moreover, such inextricably intertwined acts are considered direct evidence of the offense. *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992).

## B.    Mailing Threatening Communications

A violation of 18 U.S.C. § 876(c) requires proof of the following:

First, the defendant knowingly mailed or arranged to have mailed by the United States Postal Service a letter or other communication addressed to a natural person containing a threat to injure any person; and

Second, such letter or other communication was transmitted for the purpose of issuing a threat, or with knowledge that the communication would be viewed as a threat.

Ninth Circuit Model Jury Instruction 8.47A.

"Threats generally are not entitled to First Amendment protection." *See United States v. Keyser*, 704 F.3d 631, 638 (9th Cir. 2012). "Whether a particular statement may properly be considered to be a threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault." *United States v. Orozco–Santillan*, 903 F.2d 1262, 1265 (9th Cir. 1990), *overruled in part on other grounds by Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058, 1066–70 (9th Cir. 2002) (*en banc*). However, "[i]n order to be subject to criminal liability for a threat, the speaker must subjectively intend to threaten." *Keyser*, 704 F.3d at 638.

It is not necessary that the speaker intend to follow through on the threat, commit an assault, or inflict actual physical harm. *See Planned Parenthood*, 290 F.3d at 1075. "Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" *Virginia v. Black*, 538 U.S. 343, 359-60 (2003) (quoting *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992)). Instead

of requiring that a threat must be explicit, the Ninth Circuit has held that "[t]he fact that a threat is subtle does not make it less of a threat." *Planned Parenthood*, 290 F.3d at 1075 (internal quotation omitted).

**C.      Stalking**

The elements of stalking under 18 U.S.C. § 2261A are as follows:

First, a person used the mail, any interactive computer service or electronic communication system of interstate or foreign commerce, or any other facility of interstate or foreign commerce;

Second, the use of the mail, interactive computer service or electronic communication system or other facility of interstate or foreign commerce was undertaken with the intent to injure, harass, or intimidate another person; and

Third, during or as the result of the use of the mail, interactive computer service or electronic communication system or other facility of interstate commerce, the person who did so placed another person in reasonable fear of death or serious bodily injury, or caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress to the person.

*See generally United States v. Wills*, 346 F.3d 476, 493 (4th Cir. 2003); *United States v. Fullmer*, 584 F.3d 132, 163 (3d Cir. 2009).

The term "course of conduct" "means a pattern of conduct composed of 2 or more acts, evidencing a continuity of purpose." 18 U.S.C. § 2266(2). Under the statute, the terms "harass," "intimidate," and "substantial emotional distress" have their commonsense meanings. *See United States v. Osinger*, 753 F.3d 939, 945 (9th Cir. 2014); *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015). The Ninth Circuit has specifically rejected a First Amendment challenge to the statute because it requires "both malicious intent on the part of the defendant and substantial harm to the victim." *Osinger*, 753 F.3d at 944 (quoting *United States v. Petrovic*, 701 F.3d 849, 856 (8th Cir. 2012)).

**D.      Interference with Federally-Protected Activities**

In this case, the elements of Section 245 are as follows:

First, the defendant acted by force or threat of force;

Government's Trial Brief
*U.S. v. Cole*, CR20-032JCC - 27

Second, the defendant willfully injured, intimidated, or interfered, or attempted to injure, intimidate, or interfere with a Jewish person associated with the Anti-Defamation League;

Third, the defendant acted because of the religion of that person, that is, because she was Jewish;

Fourth, the defendant acted because the person was enjoying or had enjoyed employment or any perquisite thereof by a private employer; and

Fifth, the defendant threatened to use a dangerous weapon, explosive or fire in connection with the offense.

18 U.S.C. § 245(b)(2)(C); *United States v. Lane*, 883 F.3d 1484, 1495 (10th Cir. 1989) (setting out elements).  As the Ninth Circuit has explained, the statute "requires proof of the specific intent to interfere with a federally protected activity on the basis of race [or other protected class]. Racial [or other protected class] animus must be a motivating factor in the use or threat of force."  *United States v. Makowski*, 120 F.3d 1078, 1081 (9th Cir. 1997).  In order to violate the statute, the government need not prove that the defendant knew he was violating the law, only that he targeted the victim because of their status.  *See United States v. Griffin*, 525 F.2d 710, 712 (1st Cir. 1975) ("It was, of course, unnecessary for the government, in order to prove willfulness, to show that in attempting to impede blacks from going to school, defendant knew he was violating a federal statute. It was enough . . . that he purposely sought to interfere with the right of black children to go to school; he need not know the exact extent, or the federal character of that right.").

## EVIDENCE OVERVIEW

### A.      The Encrypted Chats

The government will offer the encrypted Wire chats at trial.  The statements made by Cole are admissible as statements of a party opponent under Federal Rule of Evidence 801(d)(2).  The statements made by the other members of the chat group are admissible as co-conspirator statements made in furtherance of the conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E).  Under Rule 801(d)(2)(E), a statement made by a co-

conspirator is admissible if the government establishes by a preponderance of the evidence: (1) the existence of a conspiracy; (2) the defendant's connection to it, and (3) that the statement was made during and in furtherance of the conspiracy. *Bourjailly v. United States*, 483 U.S. 171, 175 (1987); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir. 1982). The statements themselves may help establish their admissibility and reliability under 801(d)(2)(E). *See Bourjailly*, 483 U.S. at 175; *see also United States v. Schmit*, 881 F.2d 608 (9th Cir. 1989). However, there must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement. *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988). Circumstantial evidence is sufficient. *See, e.g.*, *United States v. Mason*, 658 F.2d 1263, 1269 (9th Cir. 1981) (evidence that defendant visited coconspirator's residence just prior to time coconspirator advised he had drugs was sufficient to connect defendant to the conspiracy).

To satisfy the "furtherance" requirement, the statement must be said to "'further the common objectives of the conspiracy,' or, 'set in motion transactions that [are] an integral part of the [conspiracy].'" *United States v. Layton*, 720 F.2d 548, 555 (9th Cir. 1983). Examples of statements "in furtherance" of a conspiracy include statements that keep a conspirator abreast, *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987); induce continued participation, *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977); allay fears, *United States v. Layton*, 720 F.2d 548, 557 (9th Cir. 1983); explain co-conspirators' roles, *United States v. Moody*, 778 F.2d 1380, 1382-83 (9th Cir. 1985), *amended by* 791 F.2d 707 (9th Cir. 1986); or aim to avoid detection, *United States v. Sears*, 663 F.2d 896, 905 (9th Cir. 1981). The focus is on the declarant's intent in making the statement, not on its actual effect of promoting the goals of the conspiracy. *See, e.g.*, *United States v. Layton*, 720 F.2d 548, 557 n.5 (9th Cir. 1983).

Additionally, it is not necessary that the statement be made to another member of the conspiracy for it to come under Rule 801(d)(2)(E). *See, e.g.*, *Zavala Serra*, 853 F.2d at 1516 (statements to government informant); *United States v. Taylor*, 802 F.2d 1108,

1117 (9th Cir. 1986) (statements to undercover FBI agent); *United States v. Echeverry*, 759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover DEA agent); *United States v. Smith*, 623 F.2d 627, 631 (9th Cir. 1980) (statement to informant).

The order of proof is left to the discretion of the Court such that a co-conspirator's statements may be admitted subject to being struck for failure of independent proof of the existence of the conspiracy and the defendant's connection to it. *See, e.g.*, *United States v. Perez*, 658 F.2d 654, 658 59 (9th Cir. 1981).

Finally, the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 56 (2004), has no effect on the admissibility of statements by co-conspirators in furtherance of a conspiracy. Specifically, the Supreme Court found that the statements of co-conspirators are not made with the expectation that they will be used at trial, and therefore there is no Sixth Amendment violation by an inability of the defendant to cross examine the coconspirators who made the statements. *Id. See also United States v. Larson*, 460 F.3d 1200. 1213 (9th Cir. 2006) (Ninth Circuit recognizing that the admission of co-conspirator statements do not violate the Sixth Amendment).

In this case, the chats are clearly co-conspirator statements. First, there is sufficient proof of the existence of a conspiracy apart from the chats, and that the defendant was part of the conspiracy. For example, the defendant outlined the conspiracy, and admitted his role in it, when talking with the undercover officer and CHS during a recorded conversation. Finally, there is no serious question that the chats were in furtherance of the conspiracy, given they all relate to the planning and execution of the scheme in this case.

**B.     The Recording and Transcript**

The government will offer the video and audio recording from the meeting between Cole and the undercover agent and the CHS during which Cole talked about the scheme. The undercover agent can authenticate the video as a true and accurate depiction of his interactions with Cole. *See United States v. Lance*, 853 F.2d 1177, 1182 (5th Cir. 1988).

1     The government has prepared a transcript of the recording, which will display as

2 the recording plays.  In the Ninth Circuit, it generally is appropriate to provide a

3 transcript to the jury as long as (1) the Court resolves any objections to the accuracy of

4 the transcript; (2) the testifying witness independently verified the accuracy of the

5 transcript; and (3) the jury is instructed that the transcript is not evidence, only an aid, and

6 that the audio controls to the extent there is any discrepancy between the audio and the

7 transcript. *See generally United States v. Booker*, 952 F.2d 247, 250 (9th Cir. 1991).  In

8 this case, all three elements have been or will be met.  First, the government has provided

9 a copy of the transcript to the defense, and is not aware of any objections to its accuracy.

10 Second, the witness who introduces the recording will verify the accuracy of the

11 transcript.  Finally, the Court should instruct the jury that the recording controls to the

12 extent there is any discrepancy with the transcript.

13 **C.     The Items Tying Cole to the Hindi Moniker**

14     The government understands that Cole will dispute at trial that he was the person

15 who used the Hindi moniker in the chats.  As outlined above, the government will offer

16 multiple pieces of evidence tying him to the chats.  This evidence will include the fact

17 that, during the Wire chats, पकजबतचषथबल made posts: (1) referencing a news story

18 about Cole in a manner that made clear that पकजबतचषथबल was Cole; (2)

19 acknowledged that पकजबतचषथबल had been served with an Extreme Risk Protection

20 Order under which पकजबतचषथबल's  guns were seized; (3) referencing a separate news

21 story about Cole and acknowledged that a warrant had been issued for Cole's arrest for

22 violating that Order in a manner that, again, made clear that Cole was पकजबतचषथबल.

23 The government will offer these chats, as well as evidence that Cole was in fact served

24 with an Extreme Risk Protection Order (ERPO); that his guns were seized pursuant to

25 that Order;  and that an arrest warrant for Cole was issued for violating the ERPO.

26     All of this evidence is admissible to prove identity, that is, to prove the highly-

27 relevant point that Cole is पकजबतचषथबल.  This is fully consistent with Rule 404(b).

28

1  As an initial matter, Rule 404(b) applies only to evidence extrinsic to the offense; not to

2  evidence "inextricably intertwined" with the charges.  *United States v. Vizcarra-*

3  *Martinez*, 66 F.3d 1001, 1013 (9th Cir. 1995).  Evidence is "inextricably intertwined" if it

4  is "part of the transaction that serves as the basis for the criminal charges."  *Id.*  Here, the

5  chats at issue  chats between Cole and his co-conspirators over Wire, which is the

6  platform the group used to plan the conspiracy.  Accordingly, the chats themselves are

7  intrinsic to the charges and do not implicate Rule 404(b).

8       While evidence of the ERPO and Cole's arrest warrant *are* extrinsic to the

9  charges, that evidence is admissible under Rule 404(b).  Rule 404(b)'s purpose is to

10  exclude so-called "bad man evidence," that is, evidence of crimes or bad acts intended to

11  impugn the defendant's character for the purpose of showing the defendant's propensity

12  to commit a crime.  *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007).  However,

13  Rule 404(b)(2) specifically authorizes the admission of evidence "of any other crime,

14  wrong, or act" to prove the identity of the defendant.  *See generally United States v.*

15  *Major*, 676 F.3d 803, 808 (9th Cir. 2012) ("Rule 404(b) is a rule of inclusion-not

16  exclusion . . . .").  "Once it has been established that the evidence offered serves one of

17  the[] purposes [set forth in Rule 404(b)(2), the relevant Advisory Committee Notes make

18  it clear that the 'only' conditions justifying the exclusion of the evidence are those

19  described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury,

20  undue delay, waste of time, or needless presentation of cumulative evidence." *Curtin*, 489

21  F.3d at 944. [1]

22       Evidence of the ERPO and arrest warrant is identity evidence that falls squarely

23  within Rule 402(b)(2).  The fact that Cole was subject to an ERPO and an arrest warrant

24  for violating the ERPO is highly relevant because पकजबतचषथबल admits that *he* is

25  subject to an ERPO and arrest warrant.  Furthermore, to the extent the chats fall within

26

27  _____

28  [1] Consistent with the rule, the government provided advance notice to the defense that it intended to offer this evidence.

Rule 404(b), they too are admissible as identity evidence.  In these chats,

पकजबतचषथबल specifically comments on articles about Cole's ERPO and arrest warrant

in a manner that *implicitly admits that he is Cole*.  Accordingly, the chats and evidence of

the ERPO and arrest warrant are admissible to prove identity, that is, that

पकजबतचषथबल is Cole.

Moreover, this identity evidence is not excludable under Rule 403.  To be clear,

Cole is the one putting his identity in dispute by contesting the fact that he was the person

using पकजबतचषथबल.  If Cole stipulated to that fact, the government would not be

offering this evidence.  By putting the issue in dispute, the government should not be

hamstrung from offering evidence that definitively proves that he was in fact the person

using पकजबतचषथबल.  Moreover, any prejudice to Cole can be minimized by the fact

that the jury can be given a limiting instruction.  *Weeks v. Angelone*, 528 U.S. 225, 234

(2000) ("A jury is presumed to follow its instructions.").  Finally, the government will

not refer to the ERPO or the arrest warrant at trial other than to link him to the moniker.

**D.     The King 5 News Story That Enraged Cole**

During the January 2019 meeting, Cole expressed his anger at the Seattle news

reporter for a story he had done on Cole after his guns were seized pursuant to the ERPO.

The story is admissible to show Cole's intent in retaliating against the reporter.  In order

to minimize any potential prejudice, the government has redacted large portions of the

story, including portions where state and city prosecutors were interviewed about the

case.

**E.     Testimony from Victims**

Each of the victims will testify about the posters that they received and the

resulting fear that the felt.  In threat cases, a recipient's reaction to an alleged threat is

relevant to the question of whether the sender would have understood that his

communication would be interpreted as a threat.  *See generally United States v. J.H.H.*,

22 F.3d 821, 827 (8th Cir. 1994) ("Evidence showing the reaction of the victim of a

threat is admissible as proof that a threat was made."); *United States v. Fulmer*, 108 F.3d 1486, 1500 (1st Cir. 1997) ("[D]etermining a "true threat" from the perspective of the person who makes the statement—we have found that evidence of the effect of the threat upon its listener is relevant to what a reasonable person in the position of the speaker should have foreseen."); *United States v. Barcley*, 452 F.2d 930, 934 n.6 (8th Cir. 1971) ("[P]roof of the effect of an allegedly threatening letter upon the addressee would throw light upon the intent of the sender."); *United States v. Spurilli*, 118 F.3d 221, 228 (4th Cir. 1997) (court credited fact that ATF agent who received the threat felt it was serious enough to patch it through to a Special Agent at 6:30 a.m. in determining whether a "true threat" was made).

**F.    The Forensic Evidence**

The government will call FBI forensic analyst John Powers to testify about files recovered from Cole's computer, such as the photograph associated with the पकजबतचषथबल moniker.  Mr. Powers will also explain to the jury the role of slack space on a computer, and will identify data recovered from slack space on Cole's computer that is closely related to the posters, such as the names of the victims.  The government previously disclosed Powers as an expert to the defense.

**G.    The Other Items Recovered From Cole's Residence**

The government will offer photographs depicting Cole's residence and his room. The photographs show (1) the AWD and Nazi flags hanging in his room and in the main living room; (2) the AWD military-style jackets hanging in his closet; (3) an AWD patch found in his room; and (4) skull masks recovered from his car.  These items are admissible to prove Cole's affiliation with AWD and his motive in committing the offenses.  The government also will show photographs of various items from his room demonstrating that the room in fact belonged to Cole.  For example, the government will show photographs of Cole's passport and other identification documents that were found in his room.

1  |  DATED:  September 13, 2021

2  |  Respectfully submitted,

3  |  TESSA M. GORMAN
   |  Acting United States Attorney
4

5  |  _/s/ Thomas M. Woods_
6  |  THOMAS M. WOODS
   |  SETH WILKINSON
7  |  Assistant United States Attorneys
8  |  United States Attorney's Office
   |  700 Stewart Street, Suite 5220
9  |  Seattle, Washington 98101-1271
   |  Telephone: (206) 553-7970
10

Government's Trial Brief
*U.S. v. Cole*, CR20-032JCC - 35